## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JOANN PIXLEY,

       Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

CASE NO. 1:23-CV-00746

MAGISTRATE JUDGE AMANDA M. KNAPP

**MEMORANDUM OPINION AND ORDER**

Plaintiff JoAnn Pixley ("Plaintiff" or "Ms. Pixley") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned pursuant to the consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.

For the reasons set forth below, the final decision of the Commissioner is **VACATED** and the case is **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should: consider the entire record, including the medical evidence from June through December 2019 that predates Plaintiff's application for benefits; accurately discuss the evidence; consider whether the entire record supports a closed period of disability, with a continuous 12-month period of disability beginning on or after June 16, 2019; clearly articulate the rationale for her findings regarding any closed period of disability; and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

1

## I.  Procedural History

Ms. Pixley filed an application for SSI on December 4, 2019, alleging a disability onset date of June 16, 2019. (Tr. 171.)  She alleged disability due to epilepsy and epileptic syndromes, traumatic brain injury, heart conditions, joint pain, cognitive communication defect, depression, fractured left leg, fractured right collar bone, left foot drop, fractured shoulder blade, fractured unspecified parts on spine, muscle issues, dysphasia oropharyngeal, enterocolitis due to clostridium difficile.  (Tr. 172.)  Her application was denied at the initial level (Tr. 183) and on reconsideration (Tr. 194), and she requested a hearing (Tr. 204).  A hearing was held before an Administrative Law Judge ("ALJ") on October 21, 2021 (Tr. 145-70) with a supplemental hearing held on February 2, 2022 (Tr. 115-44).  The ALJ issued an unfavorable decision on June 23, 2021.  (Tr. 16.)  Ms. Pixley's request for review of the decision by the Appeals Council ("AC") was denied on February 13, 2023, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)  The matter is fully briefed and ripe for review.  (ECF Docs. 8, 10, 11.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Pixley was born in 2000 and was 19 years old on the alleged disability onset date, making her a younger individual under Social Security regulations.  (Tr. 1148.)  She had at least a high school education.  (*Id*.)  Ms. Pixley had no prior relevant work. (Tr. 35.)

### B.  Medical Evidence

Although the ALJ identified numerous medically determinable impairments—mental and physical, severe and nonsevere (Tr. 19-20)—this appeal focuses on Ms. Pixley's physical impairments following a motor vehicle accident during the period between June 2019 and

September 2020.  (ECF Docs. 8, 12.)  The evidence summarized herein therefore focuses on Ms. Pixley's physical impairments during that time period.

### 1.    Relevant Treatment History

On June 16, 2019, Ms. Pixley was injured in a motor vehicle accident.  (Tr. 4574-75; *see also* Tr. 1205, 4630.)  It took fifteen minutes to extract her from the accident, and she lost consciousness secondary to a brain injury with an initial Glasgow Coma Score of 9 but a score of 4 upon admission.  (Tr. 419, 4574.)  Ms. Pixley was taken to the emergency department at St. Elizabeth's Hospital in Youngstown, Ohio, where she was admitted to the trauma team and placed on a ventilator.  (Tr. 1205, 4526, 4636.)  The collision caused the following fractures: right clavicle, left tibia, left fibula, left ankle, cervical spine at C2, left parietal region of the skull, left scapula, pelvis, and lumbar spine at L3-5 on the left side.  (Tr. 3332-38, 3347, 3353.)  Ms. Pixley also sustained a traumatic brain injury ("TBI").  (Tr. 440-41.)

Ms. Pixley underwent several surgical procedures following the accident.  (*See* Tr. 4550.)  On June 19, 2019, she underwent a vena cava placement then had anterior pelvic fracture surgery, left sacroiliac screws, and open reduction and internal fixation ("ORIF") of her left ankle. (Tr. 1205, 4550.)  On June 21, 2019, she underwent a right clavicle ORIF.  (*Id.*)  On June 22, 2019, Ms. Pixley underwent a C1-C2 wiring fusion to fix a broken neck, performed by neurologist Chander M. Kohli, MD. (Tr. 4476-77l; 4550.)

Ms. Pixley was discharged from St. Elizabeth's on July 15, 2019, and transferred to Heather Hill Care Community, a skilled nursing facility.  (Tr. 4625-26; *see also* Tr. 672.)  Upon discharge, she was non-weight bearing for both lower and upper extremities.  (Tr. 4658.)

Ms. Pixley was examined at Heather Hill to assess her baseline status by Karim Raz, M.D., on July 16, 2019.  (Tr. 440.)  Ms. Pixley breathed through a ventilator and had a direct-to-

abdomen feeding tube (PEG).  (*Id.*)  Dr. Raz noted that Ms. Pixley was "pulling up the sheets"
seemed "restless" and that he was unable to obtain any pertinent information from her.  (*Id.*)  Dr.
Raz was therefore unable to perform most types of examination, including neurological.  (*Id.*)
About a month later on August 12, 2019, Dr. Raz assessed Ms. Pixley's progress.  (Tr. 1114.)
Ms. Pixley had a tracheostomy for breathing through the ventilator and was therefore unable to
speak.  (Tr. 1116-17.)  Her level of consciousness was rated "unaware of safety needs."  (Tr.
1115.)  Ms. Pixley was still tube fed and took no food by mouth.  (Tr. 119.)  Examination
findings included: abnormal gait; unable to perform hand grasps; total dependence for feeding;
non-ambulatory/non-weightbearing; total care needed for mobility, transfer; bowel incontinent
and Foley catheter; total assistance needed for self-care.  (Tr. 1114-20.)

Ms. Pixley underwent extensive rehabilitation—including physical, occupational, and
speech therapy—during her three-and-a-half-month stay at Heather Hill.  (*See e.g.*, Tr. 494,
2362.)  A physical therapy evaluation and plan of treatment was completed by Tiffany Hughes,
PT, on August 13, 2019.  (Tr. 533.)  Examination findings included: 2/5 lower extremity
strength; unable to sit (total dependence); did not attempt static standing; posture was head
down; lower extremity muscle tone was spastic, hypertonic; impaired gross motor coordination,
sensation, visual perception.  (Tr. 534.)  Ms. Pixley was not able to follow directions but had
"intermittent periods of alertness."  (*Id.*)

On August 19, 2019, Ms. Pixley was seen by neurologist Dr. Kohli for a follow-up to her
cervical spine fusion.  (Tr. 3212.)  She was still intubated and arrived on a gurney.  (*Id.*)
Examination findings showed a healthy incision site, fair station.  (*Id.*)  Dr. Kohli asked for a
follow-up in four weeks and ordered new cervical and brain CT scans.  (*Id.*)

A follow-up with Dr. Kohli was held on September 17, 2019.  (Tr. 3204.)  Ms. Pixley arrived at the appointment on a gurney.  (*Id*.)  Dr. Kohli noted that Ms. Pixley was "doing well, improving" and had recently had her tracheotomy tube removed after passing oxygen testing at Heather Hill.  (*Id*.)  Examination findings showed fair station and no tandem gait.  (*Id*.)  Head and cervical CT scans revealed stable brain and that her neck was healing.  (Tr. 3205.)  Dr. Kohli advised a follow-up in four months.  (*Id*.)

On October 17, 2019, Dr. Raz of Heather Hill performed another progress-assessment examination, from which he rated Ms. Pixley's mobility as "Chairfast: ability to walk severely limited or non-existent. Cannot bear own weight and/or must be assisted into chair or wheelchair." (Tr. 1147.)  She was able to make frequent though slight changes in body or extremity position independently.  (*Id*.)

Ms. Pixley was discharged from Heather Hill to a rehabilitation center closer to her home in Ashtabula County on October 29, 2019.  (Tr. 448-49, 494.)  The day before discharge, occupational therapist Rachel M. Baum, OT, reported that Ms. Pixley: was able to use a washcloth to wash with standby assist; was able to move into an armed chair from her bed with minimal assistance from two people; and tolerated sitting up for five minutes.  (Tr. 494.)  Upon discharge, she was on a pureed diet, had no breathing issues, and reported to Dr. Raz that she was able to stand with a walker for nearly one minute.  (Tr. 1192.)

A physical examination of Ms. Pixley performed at Ashtabula Nursing Home on October 31, 2019, showed: Ms. Pixley struggled to talk and did not want to talk much; her lungs showed decreased air bilaterally; the trach site looked healed; and Ms. Pixley was moving all of her extremities, but the rest of the examination was limited.  (Tr. 2362.)  No mobility assessment was provided.  A functional status examination performed on November 6, 2019, by Amy Saxion,

RN, stated that Ms. Pixley could, with staff assistance to stabilize herself: move from seated to standing; move on and off the toilet; and transfer between the bed and chair.  (Tr. 2398, 2433.) While the assessment included walking and turning around, these items were not attempted with Ms. Pixley.  (*Id*.)  She used a wheelchair.  (*Id*.)  She was still on a feeding tube (less than 25% of calories) and receiving pureed foods.  (Tr. 414-15.)  Ms. Pixley's PEG tube was removed on November 26, 2019.  (Tr. 2542.)

On December 13, 2019, about a week before Ms. Pixley's discharge from Heather Hill, Sarah Terry, RN, assessed the following physical limitations: unsteady gait requiring supervision; impaired balance; weakness; required assistance with bed mobility, transfers, toileting; and incontinence of urine and bowels.  (Tr. 2898-902.)  Ms. Pixley was receiving physical, occupational, and speech therapy at the nursing home.  (Tr. 2903.)  Skilled charting notes from RN Terry the same week reported: unsteady gait; impaired balance; weakness.  (Tr. 2911, 2917, 2924 (December 15, 16 & 18, 2019).)  Ms. Pixley needed extensive one staff assist with activities of daily life and with a walker for transfers.  (Tr. 2928 (December 19, 2019).)

A physical therapy progress report from December 17, 2019, reported the following: ability to walk 300 feet on level surface with wheeled walker; maintained static and dynamic standing for 1-2 minutes without support; "standing stability is limited and requires [contact guard assist]" due to intermittent lower extremity weakness that can be corrected with assistive device.  (Tr. 2988.)  The report stated that Ms. Pixley's remaining impairments were: impaired transfers, ambulation, static and dynamic standing balance, strength deficits, coordination impairments, and cognitive impairments.  (Tr. 2989.)

On December 21, 2019, Ms. Pixley was discharged from Ashtabula Nursing Home to her parents' home with home health services after a 51-day stay at Heather Hill.  (Tr. 2357-58.)

Upon discharge, she required total assistance with ambulation, transferring positions, bathing, dressing, and toileting.  (Tr. 2942; *see generally* Tr. 2358-59.)  Ms. Pixley had weakness and an unsteady gait requiring supervision.  (Tr. 2942.)   She was prescribed a wheelchair, hospital bed, and bedside commode stabilizer cane.  (Tr. 2359-60).

Ms. Pixley had a follow-up with her neurologist, Dr. Kohli, on January 14, 2020.  (Tr. 3189.)  She attended in a wheelchair and was accompanied by family.  (Tr. 3189-90.)  On examination, she was noted to be in a wheelchair and unable to perform a tandem gait.  (Tr. 3190, 4584.)  She reported stiffness in her hips and ankles, vision problems in her right eye, headaches, and dizziness.  (Tr. 3190.)  At this time, Ms. Pixley was receiving home-based speech, occupational, and physical therapies.  (Tr. 3189.)

On the same day, Ms. Pixley attended an orthopedic examination with John Gentile, DO, who had performed her leg and ankle surgeries in June and August 2019.  (Tr. 4553-57.)  Ms. Pixley was seven months from her initial trauma and five months from her most recent surgery and complained of prominent hardware and persistent equinus contracture of her left ankle.  (Tr. 4555.)   Although she was happy with her progress overall, she reported that her left ankle hardware was bothersome and prevented her from bringing her left foot into a neutral position (*i.e.*, equinus contracture).  (*Id.*)  On examination, Dr. Gentile noted normal motor and sensory function, full strength, and a normal gait and station.  (Tr. 4556.)  But he observed that Ms. Pixley had severe equinus contracture of the left ankle that was not correctable passively.  (Tr. 4558.)  He advised removal of hardware, noting that removal would not guarantee pain relief.  (Tr. 4556-57.)  Ms. Pixley was scheduled for removal of syndesmosis screws in her left ankle (Tr. 4557), and the removal procedure was performed on January 22, 2020 (Tr. 3172-80).

Ms. Pixley established care with family physician Elaina Williams, D.O., on January 16, 2020.  (Tr. 4329.)  She reported deformity and pain in her left ankle.  (Tr. 4331.)  On physical examination, she was well appearing, alert, and in no acute distress.  (*Id*.)  She had no deformities or edema in her extremities.  (*Id*.)  With respect to her left ankle, Dr. Williams advised Ms. Pixley to continue to follow-up with neurology and orthopedics and ordered a lightweight wheelchair and handicapped parking pass.  (*Id*.)

At a two-week post-surgery visit with Dr. Gentile on February 4, 2020, Ms. Pixley reported that her pain was moderately controlled.  (Tr. 4550.)  Physical examination findings noted left ankle deformity, including a 180-degree equinus contracture, a severely contracted Achilles tendon which was palpable, and a palpable posterior tibial and dorsalis pedis pulse.  (Tr. 4551.)  Based on these findings, Dr. Gentile diagnosed Ms. Pixley with acquired posterior equinus, left.  (*Id.*)  Dr. Gentile stated that this was now a "fixed contracture and severe [sic] of the left ankle," and recommended a percutaneous Achilles release to help stretch the Achilles. (*Id.*)  He also noted that Ms. Pixley would "[p]robably" need a posterior tibial tendon lengthening for the varus deformity and would "most likely" need claw toe correction of all five toes.  (*Id.*)  After these procedures, he recommended "distraction arthroplasty" to allow her ankle to get into a normal position.  (*Id.*)  Dr. Gentile stated that it would take at least a month to get the ankle contracture corrected, and an additional two months in a frame to prevent recurrence. (*Id.*)  He estimated that it would be a three-hour long surgery for which Ms. Pixley would be admitted because it would be necessary to "do significant neurovascular checks after the first 24 hours and [Ms. Pixley would] need to learn to take care [of] and distract her ankle."  (*Id.*)

At a February 17, 2020 follow-up with Dr. Williams, Ms. Pixley reported that the ankle surgery to remove pins had not alleviated her pain.  (Tr. 4341.)  She was well appearing and in

8

no acute distress but continued to report left ankle pain.  (Tr. 4342.)  Dr. Williams noted that Ms. Pixley had an upcoming appointment for a surgical consultation to discuss external fixator placement and advised a follow-up in three months, after her next ankle surgery.  (Tr. 4341.)

On February 25, 2020, surgeon John K. Sontich, M.D., performed the following procedures: left ankle application of LRF frame, left percutaneous Achilles release, left posterior tibial tendon lengthening, left claw toe release for digits 1-5, and left ankle distraction arthroplasty.  (Tr. 5335-38.)  Dr. Sontich noted that Ms. Pixley's left foot was "really parallel with her tibia" and that physical therapy attempts to alleviate this severe contracture had not worked because it was untreatable without surgery.  (Tr. 5336-37.)  Due to the severity of the contracture, Dr. Sontich indicated Ms. Pixley's toes would need to be pinned down while they were released because the Achilles-erb  and tibial-tendon lengthening would cause them to flex down.  (Tr. 5337.)  Once pinned, she was not able to move her toes.  (Tr. 5339.)

The next day, on February 26, 2020, Ms. Pixley was evaluated by occupational therapist Jennifer Weightman, OT.  (Tr. 5339.)  Ms. Pixley reported a pain level of 10/10.  (Tr. 5340.) OT functional assessment provided the following:  grooming required a standby assist unless seated; standby assist for upper body dressing but maximum assist for lower body; standby assist for bathing, bed mobility supine to sit.  (Tr. 5340.)  A functional assessment of her abilities with use of a wheeled walker provided: standby assist for static standing, and minimal assistance for dynamic standing.  (Tr. 5341.)  OT Weightman provided the following summary:

> Overall pt demonstrated decreased independence and safety during completion of ADL/functional transfers/mobility tasks. Pt demonstrating fair understanding of education/techniques, requiring additional training / education. Pt would benefit from continued skilled OT to increase functional independence and quality of life.

(*Id.*)

A physical therapy assessment was performed on the same day by Michael Kotyuk, PT. (Tr. 5342.)  Ms. Pixley was able to ambulate 30 feet with a wheeled walker but put minimal weight on her left leg; she ascended and descended two stairs with two sides of handrails; she could sit independently, stand dynamically with a wheeled walker and standby assist.  (Tr. 5343.)  PT Kotyuk advised physical therapy 2-5 times a week for 1-2 weeks.  (Tr. 5344.)

On March 3, 2020, Ms. Pixley had a one-week post-surgery follow-up with John K. Sontich, M.D., at St. Elizabeth Orthopedic Trauma.  (Tr. 4547.)  She was having muscle spasms in her calf, which Dr. Sontich said was not uncommon with this procedure.  (*Id*.)  Dr. Sontich reported that she was "doing well" and her incisions were clean and dry, and her ankle was corrected with pins well-placed.  (*Id*.)  She was 50% weightbearing and was instructed to come back in two weeks for an ankle x-ray.  (Tr. 4547.)

At her follow-up with Dr. Sontich on March 17, 2020, Ms. Pixley was three weeks post-surgery; she was partially weight-bearing, had mild pain treated with gabapentin and baclofen, was doing a home exercise program, and continued to turn her ankle frame twice daily.  (Tr. 4545.)  X-rays showed improved dorsiflexion, pins in place, frame in good alignment.  (*Id*.)  Ms. Pixley reported that she was using a walker.  (*Id*.)  She was advised to continue weightbearing as tolerated and return in two weeks.  (*Id*.)

Ms. Pixley had her next post-surgery follow-up on April 14, 2020, with Jessica Dellostritto, PA-C, of St. Elizabeth Orthopedic Trauma.  (Tr. 4543.)  She was ambulating with an "assistive device, walker" and reported being able to stand up at her bedside with minimal assistance.  (*Id*.)  Her pain was mild; she was doing a home exercise program, had finished turning the frame, and was working on desensitization.  (*Id*.)  PA-C Dellostritto advised Ms. Pixley to continue weightbearing as tolerated and to keep working on desensitization.  (*Id*.)

On May 26, 2020, Dr. Sonich performed the following procedures: removal of the wire ring external fixation device of the left leg; excisional debridement of pin sites, bone, subcutaneous tissue, and skin of the left leg; and removal of deep pins, toes one through five. (Tr. 5305.)  Prior to the procedure, Ms. Pixley's ankle, foot, and toe range of motion in her left leg was limited by the external fixator.  (Tr. 5304.)

During a physical therapy evaluation on June 3, 2020, Ms. Pixley reported to Michael P. Jones, PT, that she was mobilizing primarily with a hand- and foot-propulsion wheelchair.  (Tr. 5476.)  She had been "up and walking" prior to the May surgery but was less mobile now.  (*Id*.)  She stated that she used to be a horse trainer and would like to ride horses again someday.  (*Id*.)  It was painful to put weight on her left leg.  (*Id*.)  Ms. Pixley performed limited work on the family farm.  (*Id*.)  (Tr. 5476.)  PT Jones assessed her with 10% ability to complete functional tasks with her lower extremity.  (Tr. 5476.)

At her two-week post-surgery orthopedic exam on June 9, 2020, Ms. Pixley ambulated with a walker and CAM boot.  (Tr. 4536.)  She reported mild pain.  (*Id*.)  She also used a walker at her June 29, 2020 physical therapy session.  (Tr. 5494.)  PT Jones stated that she worked hard throughout the session, demonstrated good gait mechanics on treadmill, and reported that one of her long-term goals was to "perform 10-meter walk test over 1.1 m/sec with no use of assistive device with no abnormal pattern noted."  (*Id*.)

On July 6, 2020, Ms. Pixley reported to PT Jones that she had walked more without a walker over the weekend, in horse stalls where she could support with her hands on the walls. (Tr. 5496.)  She was referred to aqua therapy after showing less treadmill stamina, with the hopes that it would allow her to progress further with assistive device-free walking.  (Tr. 5497-

11

98.)  Ms. Pixley stated that she "walked in the community more to get her AFO [ankle foot orthosis] with only her walker" and needed to go shoe shopping to fit her AFO.  (Tr. 5498.)

In a July 14, 2020 aqua therapy appointment with PT Jones, Ms. Pixley demonstrated a gradual progression to normalized gait pattern with repeated laps in the pool.  (Tr. 5501.)  PT Jones observed that she used a front wheeled walker when exiting the pool.  (*Id*.)

At a July 17, 2020 aqua therapy session, Ms. Pixley and her mother reported that Ms. Pixley's "improved gait mechanics carried over until the following day."  (Tr. 5502.)  Walking 10 meters over 1.1m/s with no assistive device with no abnormal patterning was still listed as a long-term goal.  (Tr. 5503.)  Ms. Pixley completed the 10-meter walk test at 0.59 meters per second during PT on July 17, 2020.  (Tr. 5504.)  She also walked with a cane for 50 feet on the same day.  (*Id*.)  PT Jones advised 8-10 additional visits with the goal of progressing to an assistive-device-free independent gait.  (Tr. 5505.)

Ms. Pixley arrived with a front wheeled walker at her July 22, 2020 PT appointment, where she demonstrated improved gait mechanics overall and reported no pain.  (Tr. 5506.)  She reported walking around the house a lot more on July 22, and her mother reported she walked around the house without her walker more on July 24.  (Tr. 5508.)

In a session with PT Jones on July 28, 2020, Ms. Pixley exclaimed, "I walked 6 steps without my walker!" (Tr. 5510.)  On July 30, 2020, she reported using her walker more and more to get out of the house.  (Tr. 5512.)  In a treatment note from PT Jones on August 10, 2020, he stated that Ms. Pixley arrived using a walker.  (Tr. 5520.)  She had reached 80% progress on the long-term goal of walking 1.1/m per second with no assistive device.  (*Id*.)

On August 11, 2020, Ms. Pixley had a follow-up with PA-C Dellostritto.  (Tr. 4525.)  Ms. Pixley ambulated with a walker but reported that she had started walking without the walker

for short distances.  (Tr. 4525.)  Her pain was mild, and she was able to return to riding her

horses and was happy with her progress.  (*Id*.)  Ms. Pixley was participating in outpatient PT and

aquatics.  (*Id*.)  She told PT Jones on August 19, 2020, that she was walking more without an

assistive device or assistance at home with improved confidence but had some increased

soreness.  (Tr. 5523.)

 In progress notes from August 28, 2020, PT Jones stated that Ms. Pixley met the goal of

being able to walk on treadmill with single hold on rail and opposite arm swing and made 50%

progress on ability to walk on flat, even surface without hip drop and without assistive device.

(Tr. 5533.)  She was given an order for a handicapped parking placard on September 8, 2020, by

Tanya Burdick, APRN, for diagnoses which included lower extremity (ankle, hip) and back

conditions.  (Tr. 5544.)  APRN Burdick treated her for wrist pain associated with walker use.

(*Id*.)  At a September 9, 2020 PT session, Ms. Pixley reported walking both with and without her

walker during a camping trip.  (*Id*.)  She arrived at PT using a walker on September 10 and 11.

(Tr. 5547, 5550.)  Ms. Pixley walked 0.83 meters per second for 10 meters without the use of an

assistive device on September 23, 2020.  (Tr. 5562.)

 On October 30, 2020, orthopedist Tyler Tsangaris-Braatz, PA-C, referred Ms. Pixley for

ten additional physical therapy sessions in order to improve her gait quality and stability.  (Tr.

4528.)  Ms. Pixley had attended 50 out of 50 prior sessions since June 3, 2020.  (*Id*.)

 On November 24, 2020, orthopedist Tyler Tsangaris-Braatz, PA-C, reported that Ms.

Pixley "demonstrate[d] ambulation in clinic full weightbearing bilateral lower extremities

without assistive device with mild Trendelenburg gait."  (Tr. 4523.)  He advised her to keep

wearing her sturdy riding boots for ankle and foot support.  (Tr. 4523.)  PA-C Braatz opined that

Ms. Pixley may be developing post-traumatic osteoarthritis.  (*Id*.)  He advised her to stay as

13

active as possible, weight bear as tolerated, and continue PT and HEP.  (*Id.*)  A new PT referral was issued.  (*Id.*)  She presented to a session with PT Jones on November 25, 2020, with no assistive device.  (Tr. 5564.)

### 2.    Opinion Evidence

#### i.    Function Report

Ms. Pixley completed an Adult Function Report on April 26, 2020.  (Tr. 353-61.)  She stated that she had not been able to walk properly since the accident on June 16, 2019.  (Tr. 353.)  She could walk with her walker for ~200 feet before needing to rest for at least five minutes. (Tr. 358.)  She used a wheelchair when leaving the house.  (Tr. 356.)  Ms. Pixley reported using a prescribed walker, wheelchair, and external halo on her left ankle for left foot drop.  (Tr. 359; see also Tr. 353, 357-58.)  She used these assistive devices "all the time" since being discharged from a nursing home on December 21, 2019.  (Tr. 359.)

#### ii.    Consultative Examinations

Consultative examiner, Natalie Whitlow, Ph.D., examined Ms. Pixley on August 3, 2020. Ms. Pixley arrived at the consultative psychological examination in a wheelchair; Dr. Whitlow did not observe any other mode of mobility.  (Tr. 4513.)  Ms. Pixley stated that her chief concerns were physical impairments, like problems walking.  (Tr. 4509.) She reported the following regarding her ability to ambulate: "I am able to walk with my walker because therapy has helped me a lot with my balance. I don't think I can work because I am in a wheelchair and, when I stand up too long (longer than 30 minutes) I get tired."  (Tr. 4510.)

#### iii.    State Agency Medical Consultants

Upon initial review, on May 21, 2020, state agency medical consultant W. Scott Bolz, M.D., completed a Physical RFC Assessment.  (Tr. 179-81.)  Dr. Bolz opined that Ms. Pixley

had the physical RFC to: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 4 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; and frequently stoop, kneel, and crouch; and occasionally crawl.  (Tr. 179.)  Dr. Bolz also opined that Ms. Pixley could not push or pull with her left lower leg because of severe equine varus contracture of ankle.  (Tr. 179.)

Upon reconsideration, on May 16, 2021, state agency medical consultant Leon Hughes, M.D., completed a Physical RFC Assessment.  (Tr. 189-91.)  Dr. Hughes's limitations were the same as Dr. Bolz's.  (Tr. 191.)   In the RFC Additional Explanation section, Dr. Hughes noted: "Changed from 12 months after onset to current.  No other changes."  (*Id*.)

On August 4, 2020, state agency psychological consultant Courtney Zeune, PsyD, completed a Psychiatric Review Technique ("PRT") (Tr. 177-78) and Mental RFC Assessment (Tr. 181-82.  In the PRT, Dr. Zeune found that Ms. Pixley had moderate limitations in her ability to: understand, remember or apply information; adapt or manage oneself; and interact with others; and concentrate, persist or maintain pace.  (Tr. 177.)  In the mental RFC, Dr. Zeune opined that Ms. Pixley could perform: simple, repetitive, one to three step tasks; tasks without strict pace or production rate; tasks requiring no more than brief/superficial social interactions with others; and would adapt best in static, stable environment free of frequent large changes that are not first explained in advance.  (Tr. 181-82.)

Upon reconsideration, on May 12, 2021, state agency psychological consultant Paul Tangeman, Ph.D., agreed with Dr. Zeune's PRT (Tr. 189) and mental RFC.  (Tr. 192-93.)

**C.     Hearing Testimony**

**1.     Plaintiff's Testimony**

Ms. Pixley testified at an online video hearing on October 21, 2021 (Tr. 145-70) and again at a supplemental hearing on February 2, 2022 (Tr. 115-44).  At the initial hearing in October 2021, Ms. Pixley testified that she could not stand for "too long" but that she liked to help out in the barn watering horses and "do stuff" while her mom cleaned out the stalls; her hips felt like they were popping out if she stood too long so she could not clean the stalls.  (Tr. 156.)  She could bathe and dress herself and tried to do some chores such as sweeping and mopping but could not do them too long because of ankle pain.  (Tr. 157.)  Ms. Pixley could not drive because of vision issues, so her mother or neighbor drove her if she needed to go anywhere.  (*Id*.)  She went to the store with her mother.  (Tr. 158.)  Her hobbies included riding her family's horses, which she was able to do although it hurt her ankle.  (Tr. 158.)  Ms. Pixley had been riding horses her whole life and lived on a farm with her family and their animals.  (Tr. 158-59.)

She reported that she had been using a walker but stopped using it around September 2020.  (Tr. 160.)  She tried to transition to a cane, but her coordination made it unsuccessful to use the cane.  (*Id*.)  Her physical therapist wanted her to go from walker to cane to walking, but ended up saying she should skip the cane and go to walking.  (*Id*.)  Ms. Pixley had some difficulties walking after she stopped using a walker, explaining that she would "randomly go blind" or get dizzy and lose her balance.  (Tr. 161.)  She would lose her vision when she lost her balance, but the blindness lasted a couple of minutes; this happened once a week or more.  (*Id*.)  When asked about difficulty walking or being on her feet, Ms. Pixley testified that she had a hard time on "rough terrain" but that she was "good" if she was on flat ground.  (Tr. 162.)  She

sometimes became dizzy.  (*Id.*)  She could stay on her feet for 10 minutes at a standstill, or 30 minutes of walking which made her less sore than standing still, before having to take a break.  (Tr. 163.)  If she was sitting, her ankle would start to swell after about 20 minutes, but it helped if she could elevate her foot.  (Tr. 163-64.)  Ms. Pixley did not really understand why the swelling happened; she did not understand her doctor's explanations due to her brain injury.  (Tr. 164-65.)  In the mornings, she would use her wheelchair for a while in the house because her ankle was sore.  (Tr. 166.)  Ms. Pixley took gabapentin and muscle relaxers for pain; she did not take pain killers and was allergic to pain killers.  (Tr. 167.)  The first hearing ended because of technical difficulties before the Vocational Expert could testify.  (Tr. 170.)

A supplemental hearing took place on February 22, 2022.  (Tr. 115.)  Ms. Pixley reported she had her wisdom teeth pulled and tried cortisone injections for her back since the last hearing.  (Tr. 124-25.)  She was still helping with the animals on her family farm as she was able, but it was harder in the winter because the cold made her joints hurt.  (Tr. 132.)

During the first hearing, counsel for Ms. Pixley proposed a closed period of disability as a second-best alternative to a finding of ongoing disability.  (Tr. 155.)  Counsel proposed a closed period again in the supplemental hearing.  (Tr. 122.)

### 2. VE Testimony

A VE testified that a hypothetical individual of Ms. Pixley's age, education, and work experience with the functional limitations described in the RFC determination could perform representative positions in the national economy, including router, marker, and housekeeper.  (Tr. 135-36.)  The VE also testified that it would preclude competitive employment if the hypothetical individual would be off task 10% of the workday, and that four absences per month would also be work preclusive.  (Tr. 137.)

17

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must
be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a
severe impairment that has lasted or is expected to last for a continuous
period of at least twelve months, and his impairment meets or equals a listed
impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must
assess the claimant's residual functional capacity and use it to determine if
the claimant's impairment prevents him from doing past relevant work.  If
the claimant's impairment does not prevent him from doing his past relevant
work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if,
based on his vocational factors and residual functional capacity, he is
capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his March 28, 2022 decision, the ALJ made the following findings:[1]

1.  The claimant has not engaged in substantial gainful activity since December 4, 2019.  (Tr. 19.)

2.  The claimant has the following severe impairments: equinus contracture left ankle, closed left ankle fracture, closed displaced fracture shaft right clavicle, closed nondisplaced fracture of body of left scapula, closed non-displaced fracture of second cervical vertebrae, open fracture parietal bone, traumatic brain injury (TBI), migraine headaches, post-traumatic osteoarthritis left ankle; degenerative disc disease cervical spine, and mild neurocognitive disorder.  (*Id.*)

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.  (*Id.*)

4.  The claimant has the residual functional capacity to perform light work except: She is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. She is able to stand and walk 4 hours of an 8-hour workday. She is able to sit for 6 hours of an 8-hour workday. She must not push and pull with the left lower extremity. She can occasionally climb ramps and stairs. She can never climb ladders, ropes or scaffolds. She can frequently balance, stoop, kneel and crouch. She can occasionally crawl. She must avoid all exposure to hazards - cannot operate heavy machinery, drive, or be exposed to unprotected heights. She can perform simple routine tasks (unskilled work) with no fast pace or high production quotas. She can have superficial interactions with others (meaning of a short

---
[1] The ALJ's findings are summarized.

duration for a specific purpose). She can perform work with infrequent change where changes are explained in advance.  (Tr. 23.)

5.  The claimant has no past relevant work.  (Tr. 35.)

6.  The claimant was born in 2000 and was 19 years old, defined as a younger individual, on the alleged disability onset date.  (*Id*.)

7.  The claimant has at least a high school education.  (*Id*.)

8.  Transferability of job skills is not material to the determination of disability.  (*Id*.)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including router, marker, and cleaner.  (*Id*.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 4, 2019, through the date of the decision on March 28, 2022.  (Tr. 36.)

## V.  Plaintiff's Arguments

Ms. Pixley raises two assignments of error on appeal.  First, she argues that the ALJ erred by failing to consider whether she was eligible for a closed period of disability, from June 2019 through September 2020.  (ECF Doc. 8, pp. 1, 13; ECF Doc. 11, pp. 1-2.)  Second, she argues that the ALJ's Step Three findings were not supported by substantial evidence because the evidence raised a "substantial question" as to whether she met or medically equaled the requirements of Listing 1.17 from June 2019 through September 2020.  (*Id*.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

21

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: Whether the ALJ Erred by Failing to Consider a Closed Period of Disability from June 2019 through September 2020**

In her first assignment of error, Ms. Pixley argues that the ALJ erred when she failed to consider a closed period of disability, despite arguments from defense counsel at both hearings that a closed period is appropriate in this case.  (ECF Doc. 8, p. 13 (citing Tr. 122, 155).)  The Commissioner makes two arguments in response.  First, the Commissioner argues that "the relevant period" for Ms. Pixley's SSI claim extends from the December 2019 filing date of her benefits application through the ALJ's decision date of March 28, 2022, and that a closed period ending in September 2020 "would not satisfy the 12-month duration requirement" for a disability claim.  (ECF Doc. 10, pp. 9-10.)  Second, the Commissioner argues that the ALJ was not required to use "magic words" to indicate that a closed period had been considered and rejected, again arguing that that the facts do not support a closed period because "the period at issue began in December 2019 and thus the duration requirement would not have been met using Plaintiff's proposed close[d] period end date of September 2020."  (*Id.* at p. 10.)  In reply, Ms. Pixley argues that the regulatory language contemplates that a claimant may establish that she met all requirements for disability before actually becoming eligible for benefits payments; she therefore argues that the June 2019 injury date is the appropriate start date for purposes of calculating duration, not the December 2019 application date.  (ECF doc. 11, pp. 1-2.)

The Court will first address the Commissioner's argument that the start date for purposes of calculating the 12-month "duration requirement" cannot be earlier than the benefits application date for Title XVI claims.  Next, the Court will address Ms. Pixley's argument that the ALJ erred when she failed to consider a closed period of disability benefits in this case.

1.    **The Duration Requirement May Be Calculated from the Date of Injury, Even When the Injury Predates the Application for Title XVI Benefits**

An individual whose impairments satisfy the 12-month duration requirement in the Social Security Act may be entitled to a "closed period" of disability benefits.  *Lang v. Sec'y of Health & Hum. Servs.*, 875 F.2d 865 (6th Cir. 1989) (table), 1989 WL 40188, at *2 (citing *Myers v. Richardson*, 471 F.2d 1265 (6th Cir. 1972); *Howse v. Heckler*, 782 F.2d 626 (6th Cir. 1986)); *see* 20 C.F.R. § 416.909 (outlining 12-month duration requirement).

Social Security's Program Operations Manual System ("POMS") explains that:

A claimant may be entitled to a closed period of disability if the evidence shows he or she was disabled or blind for a continuous period of not less than 12 months, but based on the evidence is no longer disabled or blind at the time of adjudication.

SSA POMS DI 25510.001(B).[2]  To establish a closed period of disability, the evidence must establish: the onset date; that the duration requirement is met; and the date the disability ceased.  SSA POMS DI 25510.001(B)(1).  The closed period then extends from the established onset date ("EOD") through the date the disability ceased.  SSA POMS DI 25510.001(B)(2).

Although SSI *benefits* may only be paid from the EOD onward, Social Security's operations manual provides that "[t]he *duration requirement* period begins at the time that a person is continuously unable to engage in substantial gainful activity (SGA), and has not

_____

[2] "Although without legal force, the Agency's Program Operations Manual System (POMS) . . . are persuasive authority."  *Wohler v. Saul*, No. 1:19CV56, 2020 WL 1531296, at *13 (N.D. Ohio Mar. 31, 2020) (citing *Davis v. Sec'y of Human & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989) ("Although the POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law, it is nevertheless persuasive.")).

23

engaged in SGA, because of a medically determinable impairment(s), *even if that date is earlier than the established onset date (EOD)*."  SSA POMS DI 25510.001(B)(1) (emphasis added).  In other words, the start date for purposes of calculating the 12-month "duration requirement" is when substantive disability requirements are met, even if that date precedes the "established onset date" considered for purposes of awarding and paying benefits.  *Id.*; *see also* SSA POMS DI 25505.025(D) ("REMINDER: The duration period can begin . . . prior to the filing date in title XVI claims.").  This is consistent with the regulations governing Title XVI claims, which clearly contemplate that disability requirements may be met prior to the filing date of the benefits application, but explain: "If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month."  20 C.F.R. § 416.335.

Thus, contrary to the Commissioner's arguments, both the regulations and Social Security's operations manual contemplate that the duration requirement for a closed period of disability is met where the evidence shows a continuous period of disability of 12 months or more, even if that disability period began before the application for SSI benefits was filed.

Here, Ms. Pixley alleges that she became disabled on June 16, 2019, when she was involved in a traumatic motor vehicle collision.  (Tr. 171, 172; *see* Tr. 4574-75.)  The medical records show she was hospitalized for a month following her injury, until July 15, 2019 (Tr. 5004-06), when she transferred to a skilled nursing facility (Tr. 440) where she received rehabilitation services for over three months, until October 29, 2019 (Tr. 444-48), when she transferred to another skilled nursing facility and received further services for nearly two months, until her discharge on December 20, 2019 (Tr. 2358-60).  Thus, by the time Ms. Pixley filed her

application for SSI benefits on December 4, 2019, she had been continuously hospitalized or in skilled nursing care for nearly six months because of her June 2019 traumatic injuries.

For purposes of calculating the "duration requirement," the operative start date in this case is June 16, 2019, the date Ms. Pixley was injured.  If Ms. Pixley is found disabled from her June 2019 alleged onset date through September 2020, the 12-month duration requirement is met, even if benefits cannot be awarded until an established onset date in December 2019. Therefore, the Court rejects the Commissioner's argument that the duration requirement cannot be met for a closed period of disability ending in September 2020 in this case.

### 2.      The ALJ Erred in Failing to Consider Evidence Prior to December 2019

The Court now turns to the specific question raised by the first assignment of error: whether the ALJ erred by failing to consider Ms. Pixley's eligibility for a closed period of disability benefits from June 2019 through September 2020.  There is no dispute that Ms. Pixley's counsel asked the ALJ to consider a closed period of disability.  (Tr. 122, 155.)  And there is no dispute that the ALJ did not discuss or explicitly consider Ms. Pixley's request for a closed period in her written decision.  (Tr. 16-36.)  The Commissioner argues that this was not error because "'no law exists to support' the assertion that the ALJ was 'required to use "magic words" and specifically indicate that a closed period of disability has been considered and rejected.'"  (ECF Doc. 10, p. 10 (quoting *Sielaff v. Commissioner of Social Sec.*, No. 1:10CV1571, 2012 WL 567614, at *1 (N.D. Ohio Feb. 21, 2012)).)  Ms. Pixley responds that remand is appropriate in this case because her counsel explicitly argued for a closed period, the ALJ did not acknowledge that argument in her decision, and the evidence shows that the ALJ's decision not to grant a closed period of disability lacked the support of substantial evidence. (ECF Doc. 11, p. 2.)

In *Lang v. Sec'y of Health & Hum. Servs.*, the Sixth Circuit found that an ALJ committed reversible error by "failing to consider whether [the] plaintiff might be entitled to a closed period of disability." 1989 WL 40188 at *2. The plaintiff was a former police officer who had suffered a gunshot wound in 1984. *Id.* at 1. Although the Sixth Circuit found substantial evidence supported the denial of benefits as of the hearing date in 1987, *id.*, the court also agreed with the plaintiff that the ALJ erred by failing to consider whether the plaintiff was entitled to a closed period of disability benefits from 1984 to 1986, explaining:

> In the present case, plaintiff argues that at the very least he should have been found disabled from June 9, 1984, when he was shot, through August 1986 when, according to his testimony, he felt that from a physical standpoint he was capable of returning to work. The ALJ did not specifically make a finding regarding whether plaintiff's impairments entitled him to a closed period of disability benefits. Rather, the ALJ's decision focuses upon plaintiff's physical and mental condition at the time of the hearing. In reaching his conclusion, the ALJ relied upon activities plaintiff began more than one year after the accident and upon reports made during this same time period.

*Id.* at *2. Some district courts have made similar findings where an ALJ's decision focused on the plaintiff's condition at the time of the hearing, without adequately addressing an earlier time period when a closed period of disability may have been warranted. *See, e.g., Widener v. Astrue*, No. CIV.A. 08-107-DLB, 2009 WL 2778215, at *5 (E.D. Ky. Aug. 27, 2009) (remanding for the ALJ to make specific findings whether multiple surgeries during a specified time period rendered her disabled during that discrete period); *Hutchings v. Comm'r of Soc. Sec.*, No. 3:17CV901, 2018 WL 3609434, at *2 (N.D. Ohio July 27, 2018) (remanding for the ALJ to consider whether the plaintiff was disabled prior to the initiation of a successful Botox therapy).

But numerous district courts have found that an ALJ did not commit reversible error by failing to explicitly discuss whether a closed period of disability was warranted. *See, e.g., Vest v. Saul*, No. 1:18-CV-101, 2020 WL 13468851, at *6-7 (E.D. Tenn. Mar. 2, 2020); *Melika v. Soc. Sec. Admin.*, No. 3:18-CV-00508, 2019 WL 162386, at *15 (M.D. Tenn. Jan. 10, 2019), *report*

*and recommendation adopted*, No. 3:18-CV-00508, 2019 WL 1934981 (M.D. Tenn. May 1, 2019); *Hall v. Colvin*, No. CV 15-181-DLB, 2017 WL 111926, at *3 (E.D. Ky. Jan. 11, 2017); *Evers v. Astrue*, No. 3:12-CV-118, 2013 WL 1305627, at *12 (E.D. Tenn. Jan. 2, 2013), *report and recommendation adopted*, No. 3:12-CV-118, 2013 WL 1301777 (E.D. Tenn. Mar. 28, 2013); *Sielaff*, 2012 WL 567614, *1.

As a general matter, those courts emphasized both the lack of legal authority requiring the ALJ to discuss whether a closed period was considered and the clear indications in the relevant written decisions that "the ALJ considered all of the medical evidence introduced that related to the closed period." *Sielaff*, 2012 WL 567614, *1; *see Vest*, 2020 WL 13468851, * 7 (finding "the ALJ's longitudinal review implicitly demonstrates that the ALJ found that the Plaintiff did not qualify for a closed period of disability"); *Melika*, 2019 WL 162386, at *15 (noting that the ALJ "did not find that Plaintiff met the continuous twelve-month durational requirement" after "considering the medical and testimonial evidence of record"); *Hall*, 2017 WL 111926, at *3 (concluding that "the record provides substantial evidence to support [the ALJ's] decision to decline an award of benefits, even for a temporary period" where "the ALJ did review Plaintiff's entire medical record, noting instances of both struggle and improvement throughout the years-long period"); *Evers*, 2013 WL 1305627, at *12 (finding that "the longitudinal examination undertaken in the opinion implicitly demonstrates that the ALJ found the Plaintiff did not demonstrate a closed period of disability").

Here, in contrast, the ALJ's decision does not support a finding that "the ALJ considered all of the medical evidence introduced that related to the closed period[.]" *Sielaff*, 2012 WL 567614, *1. Instead, the ALJ focused on the medical evidence following the December 4, 2019 application date (Tr. 25-34) and found Ms. Pixley "has not been under a disability within the

meaning of the Social Security Act since December 4, 2019, the date the application was filed"

(Tr. 17).  Although she mentioned the nursing home stay from October 30 to December 21, 2019

(Tr. 25) and some procedures from June and August of 2019 (Tr. 27), the ALJ explained:

> The undersigned acknowledges that the record contains evidence prior to the
> alleged onset date of December 4, 2019 (Exhibits 1F-10F, 14F-15F, 17F-22F, and
> 24F). This evidence is not helpful in determining the claimant's limitations for the
> relevant period. <u>Any reference to these medical records is purely for historical
> purposes</u>.

(Tr. 25 (emphasis added).)  It is not entirely clear what the ALJ meant when she said she only

considered the medical records showing six months of continuous hospitalization and inpatient

rehabilitation "for historical purposes."  But the phrasing certainly suggests that she did not

consider the earlier medical records in her substantive disability findings.  Since those earlier

medical records must be considered to assess whether the duration requirement was met for the

alleged closed period of disability, as discussed in Section VI.B.1., *supra*, the ALJ's written

decision does not support a finding that she considered and rejected the proposed closed period.[3]

On the contrary, like other cases warranting remand, the language of the ALJ's decision in this

case suggests that she did not consider earlier medical evidence that was necessary to assess the

appropriateness of the closed period requested by Plaintiff's counsel.  *See Lang*, 1989 WL

40188, at *2; *Widener*, 2009 WL 2778215, at *5; *Hutchings*, 2018 WL 3609434, at *2.

The Sixth Circuit has explained that it does "not endorse the position that all evidence or

medical records predating the alleged date of the onset of disability . . . are necessarily irrelevant

or automatically barred from consideration[.]"  *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x

---

[3] The Commissioner's erroneous arguments in the present case—that the "duration requirement" cannot be met based on medical findings and records that predate the Title XVI benefits application—increase this Court's concern that the ALJ's refusal to consider the earlier medical records for anything but "historical purposes" is an indication that she similarly did not consider the possibility that the earlier medical records support a closed period of disability that extends 12 months or more from the alleged onset date in June 2019 but less than 12 months from the Title XVI application filing date in December 2019.

411, 414 (6th Cir. 2006).  Instead, the Sixth Circuit "recognize[s] that evidence . . . predating the onset of disability, when evaluated *in combination with other evidence*, may help establish disability."  *Id.* (emphasis in original); *see also Caradonna*, 2019 WL 5549496, at *25 (discussing *DeBoard* and explaining that "[s]ome courts have therefore found legal error in an ALJ's failure to consider pre-onset evidence or in the ALJs discounting evidence simply because it predated onset"), *report and recommendation adopted*, No. 18-13228, 2019 WL 5538103 (E.D. Mich. Oct. 25, 2019); *see generally* 20 C.F.R. § 416.912(b)(1)(ii) (discussing the agency's responsibility to develop a claimant's "complete medical history beginning with the month [they] say [their] disability began unless we have reason to believe [the] disability began earlier" if a claimant says their disability began less than 12 months before they filed their application).

In this case, Ms. Pixley explicitly sought a closed period of disability that ended in September 2020, which could only be granted if the Commissioner found that Ms. Pixley's continuous 12-month period of disability began several months before her application for benefits was filed.  But the language in the ALJ's decision strongly suggests that the ALJ did not consider the six months of earlier medical treatment records that would be necessary to support the requested duration finding.  At the very least, the ALJ's language does not support a finding that the ALJ considered the entire record—including the records showing Ms. Pixley's hospitalization and skilled nursing care during the six months preceding her application—when she concluded that Ms. Pixley did not meet the requirements for an award of disability benefits.

While the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference "is the requirement that all determinations be made based upon the record in its entirety."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007) (citing *Houston v. Sec'y of Health & Human Servs.,* 736 F.2d 365, 366 (6th Cir.

1984)).  The *Rogers* court explained: "This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history[.]"  *Id.*; *see also* 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record).

Like the court in *Lang*, this Court finds that the ALJ's failure to clearly consider all the medical records relevant to the requested closed period of disability—here, the medical evidence relating to Ms. Pixley's treatment from June 16 through December 4, 2019—is harmful error that warrants remand.  *See* 1989 WL 40188, at *2.  Specifically, the Court finds the ALJ's decision not to consider the medical records predating Ms. Pixley's benefits application for anything other than "purely . . . historical purposes" deprives her disability determination of the support of substantial evidence because it is not clear that the ALJ considered the complete record before finding Ms. Pixley did not qualify for a closed period of disability benefits, and because the ALJ's explanation for her disability determination therefore failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Without clear evidence that the ALJ considered the entire record, this Court cannot meaningfully review the ALJ's decision not to award a closed period of disability benefits.

For the reasons set forth above, the undersigned finds that the ALJ's disability determination lacked the support of substantial evidence and that the ALJ failed to build a logical bridge between the evidence and the result.  Accordingly, the Court remands the ALJ's decision for further proceedings consistent with this Order.[4]

---

[4] Because the Court finds that remand is warranted based on Ms. Pixley's first assignment of error, it need not address her second assignment of error pertaining to whether Ms. Pixley met or medically equaled Listing 1.17.

### VII.    Conclusion

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and the case is **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.

On remand, the ALJ should: consider the entire record, including the medical evidence from June through December 2019 that predates Plaintiff's application for benefits; accurately discuss the evidence; consider whether the entire record supports a closed period of disability, with a continuous 12-month period of disability beginning on or after June 16, 2019; clearly articulate the rationale for her findings regarding any closed period of disability; and ensure that her stated rationale builds an accurate and logical bridge between the evidence and the result.

January 28, 2025

*/s/Amanda M. Knapp*

AMANDA M. KNAPP
United States Magistrate Judge